UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JAMES HOLMES,

        Plaintiff,

  v.                                              Case No. 06-C-1033

PHIL KINGSTON, et al.,

        Defendants.

## DECISION AND ORDER

Plaintiff James Holmes, a Wisconsin inmate, filed this action under 42 U.S.C. § 1983. Counsel was appointed and, after a number of extensions to the scheduling order, the defendants' motion for summary judgment is now fully briefed. For the reasons given herein, the motion will be denied.

**I. BACKGROUND**

The genesis of this case arose while James Holmes, a paraplegic confined to a wheelchair, was an inmate at Waupun Correctional Institution ("WCI"). Early on the morning of August 25, 2005, Holmes pushed the emergency call button in his cell and reported to staff that he was feeling sick after taking a large number of muscle relaxers.[1] He was taken to prison health services and then transported to Waupun Memorial Hospital. Holmes returned to WCI around 11:10 a.m. the same day, where, in light of his self-injuring behavior, he was placed in clinical observation. In his

---

[1] The facts are taken from the parties' proposed findings of fact. Except where noted, the facts cited are not disputed.

observation cell, he was not given any clothing, nor did he have his wheelchair or a catheter, which Holmes required in order to urinate. Defendants denied Holmes any clothing because, in their view, clothing could have allowed him to hide something he could use to harm himself. Defendants state that Holmes was initially very groggy when he returned from the hospital, and thus he did not seem to need his wheelchair because he was incapable (at that time) of doing anything more than just lying on the floor of his cell.

Defendants denied Holmes access to the catheter because they believed he could harm himself by using it to insert foreign objects. (Of such behavior Holmes had no prior history.) They state that they made the catheter available upon Holmes' request, but it is disputed how responsive they were to such requests. Holmes states that he frequently had to go long periods of time without being able to urinate and notes that the prison's own records show he was allowed the catheter only four times during his six-day term of observation. The fact that he lacked his wheelchair meant he could not reach the emergency call button, and so he typically had to wait until an officer checked his cell before he could make an oral request for a catheter. According to Holmes, when he awoke after returning from the hospital, staff refused to give him his catheter and Holmes responded by cutting himself with a piece of plexiglass. (Holmes Decl. ¶ 24.) The cut required stitches and another trip to Waupun Memorial Hospital. The next morning, Holmes was again observed cutting his arm with an unknown object, which required another cell extraction, after which Holmes was placed in restraints to prevent him from cutting himself again.

Holmes contends that during the six days he remained in observation he was denied a number of meals because he was unable to appear for meals at his cell door, a feat rendered impossible because he was a paraplegic and did not have his wheelchair. And, although he was

2

apparently sometimes able to reach the toilet on his own, the absence of a wheelchair made it difficult. On one occasion, he defecated on the floor of his cell and was given towels to clean up the mess. He alleges that throughout the six-day period he was forced to drag himself around on the floor (while naked), which resulted in sores all over his body.

On August 29, Holmes again cut himself with an unknown object. He stated that it was the same piece of glass he had used before and that he had swallowed and regurgitated it to hide it from staff.

Holmes filed Offender Complaint WCI-2005-27451 on September 6, 2005, complaining that while he was in clinical observation his wheelchair was taken away. Holmes' complaint stated:

> I understand my clothing and bed and linens had to be taken but my wheelchair was taken also which is my mobility. I can't walk at all so I was forced to drag myself on my hands and buttock to get my food to get water and use the rest room now with me being a paraplegic and nothing to protect my skin that caused my skin on my bottom to breakdown and also on my left foot I was left without my wheelchair from 8-26 – 30-05 and during this time I sustain injury to my buttock and left toe this was totally cruel and unusual punishment taking my wheelchair my mobility my means of movement forcing me to drag myself around.

(DPFOF ¶ 164.) The complaint was dismissed, with modifications, and Holmes' subsequent appeals were all denied. Further facts are set forth below where relevant.

## II. ANALYSIS

Summary judgment is proper where there are no genuine disputes about material facts and those facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The evidence and all reasonable inferences from the facts are to be construed in favor of the nonmoving party. *Rickher v. Home Depot, Inc.,* 535 F.3d 661, 664 (7th Cir. 2008).

**1. Exhaustion**

Holmes' present civil rights case challenges the entirety of his conditions of confinement during the period described above. Defendants argue that Holmes did not properly exhaust his administrative remedies as to any claims except for the denial of his wheelchair. His offender complaint, they note, only complained about the denial of his wheelchair and did not state that he was challenging the denial of his clothing or catheter. As such, they argue, he should be foreclosed from challenging those conditions of confinement in this litigation.

"The PLRA attempts to eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'" *Woodford v. Ngo,* 548 U.S. 81, 93 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 525 (2002)). Under 42 U.S.C. § 1997e(a), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532.

The Defendants of course concede that Holmes did exhaust his claim with respect to the denial of his wheelchair. I conclude that under the circumstances that was enough to incorporate all the other relevant conditions of his confinement and place the prison on notice that Holmes was complaining about the totality of his conditions of confinement. "As in a notice-pleading system, the grievant need not lay out the facts, articulate legal theories, or demand particular relief. All the

4

grievance need do is object intelligibly to some asserted shortcoming." *Strong v. David,* 297 F.3d 646, 650 (7th Cir. 2002).

Underlying my conclusion that Holmes' administrative complaint was sufficient is the fact that Holmes' other complaints (denial of clothing, catheter, etc.) cannot be viewed in a vacuum. Suppose Holmes had instead complained that: (1) he was being denied legal materials, (2) he had a sore on his arm, and (3) he found the prison food unpalatable. In that case, because each of the complaints can be analyzed separately, it would make sense to require separate exhaustion of each issue because none of the individual complaints alerts the prison to the existence of the other problems. But here the complaints are all intertwined, and the denial of a wheelchair is only alleged to be cruel and unusual in the *context* of the other denials alleged. That is, Holmes alleges it was particularly cruel and unusual to deny him use of his wheelchair *given that* he was also denied clothing and a catheter, which made it necessary for him to drag his naked and disabled body around the cell. Any reasonable prison complaint examiner would have viewed the absence of a wheelchair in light of the other conditions Holmes' complaint mentioned, and it thus does not make sense to analyze the denial of the wheelchair divorced from the context as though it were some abstract event. Accordingly, I conclude Holmes properly exhausted his complaint about the conditions of his confinement.

**2. Personal Involvement**

Defendants Holm, Janssen, Mittelstedt, Mays, Toney, Hilbert, Schlieve, and Skindzelewski argue that they had no personal involvement in the deprivations Holmes has alleged, and thus any claims against them should be dismissed. Holmes concedes the point as to Defendant Schlieve, but

5

argues that the rest of the defendants were all personally involved in monitoring and supervising the conditions of his confinement.

In some cases prison staff can be relieved of liability even if they are witnesses to or instrumental in a prisoner's denial of care. For instance, if a prison guard is following the orders of a physician, the guard is not typically expected to exercise his own independent medical judgment, and he may thus be relieved of liability even though he may be a witness or participant in a constitutional violation. This is not one of those cases. Although the defendants named above were not the decision-makers who removed Holmes' wheelchair, clothing and catheter, they are alleged to have personally witnessed the conditions of Holmes' confinement. Just as guards are under a responsibility to intervene to prevent other guards from abusing prisoners, guards have a duty to intervene if, as is alleged, the inmate's conditions of confinement violate the Eighth Amendment. *Fillmore v. Page,* 358 F.3d 496, 506 (7th Cir. 2004) (noting "the long-established rule that '[a]n official satisfies the personal responsibility requirement of § 1983 if she acts or fails to act with a deliberate or reckless disregard of the plaintiff's constitutional rights.'") (quoting *Crowder v. Lash,* 687 F.2d 996, 1005 (7th Cir. 1982)). This is not to say that a merely fleeting presence could be enough to satisfy the personal involvement requirement. But here the allegation is that the defendants named above had repeated contact with Holmes and knowledge of his conditions (including the fact that he was a paraplegic), and that is at least enough to allow a jury to determine their culpability (assuming the existence of an underlying constitutional violation).

### 3. Deliberate Indifference

Turning to the merits, Holmes' amended complaint alleges both inadequate medical care (deliberate indifference) as well as unconstitutional conditions of confinement. In response to the

6

deliberate indifference claim, Defendants move for summary judgment on the grounds that Plaintiff has not demonstrated the existence of a serious medical need. They further note that Holmes did receive significant levels of medical care throughout his stay in observation.

The Seventh Circuit has described the deliberate indifference analysis as follows:

> The states have an affirmative duty to provide medical care to their inmates. And the upshot of this duty is that the "deliberate indifference to [the] serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' " and violates the Eighth Amendment's prohibition against cruel and unusual punishments. To state a cause of action, a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent. Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts. And although deliberate means more than negligent, it is something less than purposeful.

*Duckworth v. Ahmad,* 532 F.3d 675, 678-79 (7th Cir. 2008) (citations omitted).

Holmes argues that he suffered from a serious medical condition (as a paraplegic) and that by denying him his wheelchair and catheter the defendants wantonly refused to accommodate that need. Although Holmes might indeed state a claim under the Eighth Amendment (as discussed below), it does not seem that the facts support a claim for deliberate indifference to a serious medical need. While I have little doubt that being a paraplegic is a serious medical condition, it is not as though the defendants were in the position of "treating" that condition in the traditional sense one finds in most deliberate indifference cases. Specifically, Holmes' paraplegia did not worsen as a result of the Defendants' conduct, and thus that is not the medical "condition" to which the defendants were deliberately indifferent. As for the other injuries Holmes sustained, the evidence suggests that the defendants did provide consistently adequate access to nurses and the local hospital in response to Plaintiff's self-inflicted injuries. There was, in other words, no "indifference" to Holmes' injuries because the Defendants made significant efforts to treat them.

7

If there is a violation here, it is not due to the defendants' deliberate indifference to Holmes' medical needs; it is due to the conditions of confinement that *caused* those medical needs in the first place. Of course the fact that he is a paraplegic is central to that analysis, but ultimately this is not a case about "indifference" to a medical condition – it is about allegedly intentional infliction of conditions of confinement that violate the basic standards of decency required by the Eighth Amendment. Accordingly, the Plaintiff's deliberate indifference claim will be dismissed.

### 4. Cruel and Unusual Punishment

Holmes' Eighth Amendment claim also challenges the general conditions of confinement. This analysis is broader than a deliberate indifference claim: rather than looking at the inmate's need for medical treatment, it simply looks at the conditions of confinement to judge whether they "deprive [the] inmate[] of the minimal civilized measure of life's necessities." *Delaney v. DeTella,* 256 F.3d 679, 683 (7th Cir. 2001) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981)). And it should go without saying that the wanton infliction of pain violates the Eighth Amendment:

> '[T]he unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment.' " *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (some internal quotation marks omitted). We have said that "[a]mong 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.' " *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). In making this determination in the context of prison conditions, we must ascertain whether the officials involved acted with "deliberate indifference" to the inmates' health or safety. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious. *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

*Hope v. Pelzer,* 536 U.S. 730, 737-738 (2002).

The Defendants essentially concede that the conditions of Holmes' confinement were harsh, and in fact they equal or exceed the conditions imposed in other cases in which courts found

8

potential Eighth Amendment violations. *See, e.g., Gillis v. Litscher,* 468 F.3d 488 (7th Cir. 2006). The Defendants attempt to justify the conditions imposed by arguing they were required by Holmes' own self-injuring behavior. For instance, they claim they feared Holmes would be able to hide a sharp implement under clothing or injure himself if he had full-time access to his catheter. They further argue that he could have hurt himself by pulling his wheelchair on top of him. Defendants also note that only months earlier Holmes had pulled off the arm of his wheelchair and sharpened it. (Schueler Aff., ¶ 9.)

Plaintiff disputes that these reasons are either truthful or persuasive. As for the wheelchair, Holmes notes that the initial decision to deprive him of the wheelchair arose not because of his self-harming tendencies but because Officer Schueler thought he "didn't need it" because he was lying on the cell floor and appearing very lethargic, like a "beached whale." (Posnanski Decl., Exs. 7 at 29, 54.) The Defendants' current explanation for removing the wheelchair is thus contradicted (or at least unsupported) by the record. In addition, Holmes notes that he had never even attempted to harm himself with his catheter. Moreover, he argues that because he was naked and under constant observation, there was little need to take the extra precautions of depriving him of either his wheelchair or catheter. Thus, even if one believes the Defendants' present explanation, the explanation is not a justification for the measures taken.

First, it seems clear that there is a genuine factual dispute about the actual rationale for depriving Holmes of his wheelchair. The Defendants' affidavits state generally that Holmes had engaged in self-harming behavior, but the affidavits are by no means conclusive. In fact, the affidavits of both Schueler and Kaemmerer, a crisis intervention worker, provide a confusing and conclusory explanation: "Holmes (sic) self-harming behavior, combined with his history of

9

self-harming behavior and his use of various means to hurt himself with, (sic) warranted limiting his property while he continued to pose a threat to himself or others." (Kaemmerer Aff., ¶ 25; Schueler Aff., ¶ 31.) Moreover, these recent elliptical statements contrast with Schueler's deposition testimony, in which he stated that the wheelchair was removed because Holmes simply didn't appear to need it at the moment he returned from the hospital. The fact that a dispute exists about the actual reason for the deprivation means that a jury could find that the reason now given by the Defendants is pretextual, i.e., an *ex post facto* effort to justify the conditions they imposed.

Just as a jury could conclude that the Defendants' stated reasons for the conditions of confinement were false, a jury could find that the conditions the Defendants imposed were not warranted by their professed concerns for Holmes' safety. I cannot conclude as a matter of law, based solely on the Defendants' limited and conclusory affidavits, that Holmes' past behavior justified the obviously harsh conditions imposed. In fact, if the Defendants' motivation was a desire to keep Holmes from injuring himself, it is questionable how removing a wheelchair and a necessary catheter would have accomplished that end. The allegation is that the Defendants were aware Holmes was forced to drag his naked self around his cell, which caused him to suffer scrapes and sores. Simply put, a jury could conclude that forcing a paraplegic inmate to drag his naked body around a prison cell was a distinctly inefficacious way of protecting that inmate from injury.

The same is true with respect for the removal of the catheter. First, if the concern was that Holmes would use it to insert foreign objects into himself (of which there is no apparent history), a jury could conclude that the fact that he was naked and under constant observation would have minimized that risk. Second, if that were a legitimate concern, one might expect that he would have harmed himself during the few times he was actually given access to the catheter, and there is no

10

indication that he did. Third, there is some suggestion that the removal of the catheter was what gave rise to much of Holmes' self-harming behavior in the first place. Making reasonable inferences in Holmes' favor, it appears he lacked many standard methods of communicating with staff to make his concerns known. It was only by inflicting an injury upon himself that required hospitalization that he was able to temporarily escape the allegedly cruel and unusual punishment.

Finally, there is a factual dispute as to how available the catheter was. Holmes asserts that it was rarely made available to him, and the Defendants' own records do not contradict that. And the fact that he had difficulty reaching the emergency call button is a factor that could have counseled against removal of the catheter, since the call button appears to be the principal method of contacting a guard to request the catheter. In sum, even if a jury concluded the Defendants' concerns for Holmes' safety were legitimately held concerns, they could still conclude that there was no rational penological justification for requiring him to wait hours or longer when he had to urinate. Holmes needed a catheter in order to urinate. When the state assumes control over a disabled inmate's most basic bodily functions, it must take that responsibility seriously in order to ensure discomfort is not inflicted needlessly or wantonly. If a jury believes Holmes' version of events, they could readily conclude that the denial of the catheter alone constituted cruel and unusual punishment.[2]

In sum, the case contains genuine factual disputes on key issues. A jury could conclude that for six days James Holmes was kept like a caged animal and that the Defendants' justification for

---

[2]The Defendants also argue for qualified immunity, noting that the plaintiff must normally point to a case involving similar circumstances in order to render the right violated a clearly established one. While true, if a jury believes Holmes' version of events and finds there was no reasonable justification for Holmes' treatment, Holmes' conditions of confinement would very clearly violate the Eighth Amendment. *See, e.g., Gillis v. Litscher,* 468 F.3d 488 (7th Cir. 2006).

11

that treatment was either contrived or (if believed) simply unpersuasive. Accordingly, the motion for summary judgment is **DENIED**, except that all claims against Defendant Schlieve are **DISMISSED**. The clerk will put the case on for further scheduling.

    **SO ORDERED** this   14th   day of October, 2008.

s/ William C. Griesbach<br>
William C. Griesbach<br>
United States District Judge